J-A25014-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.J.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.L.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 630 WDA 2023 |

Appeal from the Order Entered April 13, 2023
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): No. 86 of 2022

| | | |
|---|---|---|
| IN RE: ADOPTION OF: O.A.N | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.L.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 631 WDA 2023 |

Appeal from the Order Entered April 13, 2023
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): No 87 of 2022

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: December 6, 2023**

J.L.N. ("Father") appeals from the orders entered on April 13, 2023, involuntarily terminating his parental rights as to his two children, N.J.N., a

_____

[*] Retired Senior Judge assigned to the Superior Court.

daughter born in February 2015, and O.A.N., a son born in September 2019.[1] We affirm.

On December 19, 2022, the Westmoreland County Children's Bureau ("WCCB") filed separate petitions to terminate Father's rights as to each child, with the aim of having the children adopted by the foster family with which they both resided. The orphans' court held a hearing concerning the petitions on April 6, 2023.[2] The court summarized the ensuing relevant testimony from the hearing:

> The children were placed in WCCB custody June 4, 2021 and adjudicated dependent on June 22, 2021. Father did not attend the [dependency] hearing despite having notice. The children were placed in agency custody as a result of [N.J.N.] missing a week of school, [Mother] being homeless and living with the children with her paramour who had recently been incarcerated for drug possession, Mother testing positive for methamphetamines, and Father being unable to be located. The children had been in agency custody for [twenty-two] months at the time of the [termination] hearing.
>
> . . . .
>
> Father has not completed either hands-on parenting or the curriculum-based parenting classes. Father's visits were

---

[1] In different orders entered the same date, the orphans' court also terminated the parental rights of the children's biological mother, K.E.S. ("Mother"). She did not contest the termination proceedings and has not appealed to this Court.

[2] Diane Murphy, Esquire, was appointed to represent both children as legal counsel and as Guardian *ad litem* ("GAL") during the termination proceedings. *See* Order of Court, 2/7/23. At the hearing, Attorney Murphy confirmed that there was no conflict between either child's legal and best interests "because of their ages and the complexity of the proceeding." *See* N.T. Hearing, 4/6/23, at 3.

supervised except for a brief period between December 27, 2022 and January 27, 2023, when they were monitored. The visits went back to being supervised due to a domestic violence incident during a visit. Father has attended [eighty-seven] of the 112 visits offered. Among the concerns during visits are lack of planning during his community visits, bringing his paramour after being told not to bring her, failure to bring money for the activities with the children, inappropriate behavior (*i.e.*, talking about [N.J.N.]'s body), talking about adult issues, [and] requesting love and affirmation when the children were resistant. During visits Father spends most of his time with [N.J.N.] and does not appear to have established a bond with [O.A.N]. Father also reportedly was relying on [N.J.N.] for emotional support. Additional services were put into place to assist her with establishing boundaries with Father.

Father does not have [a] stable and appropriate address and does not have a legal and verifiable source of income. Father has told the caseworker that he receives Social Security benefits but has not offered any substantiating proof.

. . . .

Father has been incarcerated at the Westmoreland County Prison since February, 2023 and was on disciplinary [restrictions] until a week or two prior to the hearing. The counselors at the [prison] were unable to accommodate WCCB's attempts to set up visits.

. . . .

WCCB provided evidence of Father's criminal history. . . . Father is currently facing a criminal mischief charge [and] a burglary charge . . . . He also has an indirect criminal contempt charge pending for allegedly violating a Protection from Abuse order[.]

Dr. Neil Rosenblum, Ph.D.[,] was contracted to provide Father with a mental health evaluation and a parenting assessment. The mental health assessment occurred on November 17, 2021. Dr. Rosenblum testified that Father minimized his mental health and substance abuse issues. He found that Father was unable to provide a safe and secure environment for the children at the time of the evaluation and

recommended [that] Father undergo intensive dual diagnosis outpatient treatment, an evaluation by a psychiatrist, and a referral to case management.

Father did not attend his interactional assessment with Dr. Rosenblum, so the latter was unable to offer any insight into whether severing Father's parental tie would be harmful to the children. However, he did perform an interactional assessment with the children and the foster parents. The children appeared to be thriving with the foster parents. [N.J.N.] was progressing well after having been parentified[3] and suffering from some related sleep disorders. [O.A.N.] had qualified for speech and language treatment along with early Head Start.

Elaine Logan from Neveah, Inc. provided therapy services to both [N.J.N.] and Father beginning in June, 2021. [N.J.N.] presented with anxiety and emotional health concerns. She was parentified and was anxious over her concerns for her parents' safety. She was fearful that they would have a fatal overdose and often felt safer when either of them was incarcerated. While she loves Father, their relationship is more of a peer relationship rather than parent-child. She often was called upon to offer emotional support for Father. [N.J.N.] refers to her foster siblings as brothers and sisters.

. . . .

Dustin Yingling, an independent contractor with Allied Family Services[,] began providing Father services beginning in August, 2022. He was to assist Father with parenting instruction, community resources, transportation, and supervise Father's visits. Father was to have one, three-hour visit per week with the children. He attended [twelve] of [twenty-four] visits that were offered. Among the reasons offered for Father missing visits

---

[3] Dr. Rosenblum did not define or explain the term "parentified" during his testimony. However, we understand the word generally to signify the situation where a child is placed in a role of feeling the need to care for and support a parent. *See*, *e.g.*, *In re Adoption of T.L.R.*, 2020 WL 1427113 at *3 (Pa.Super. 2020) (non-precedential decision) (summarizing testimony from WCCB caseworker Molly Clayton, who indicated that "parentified" meant that children "viewed themselves as the adults in the household").

were: incarceration, illness, and failure to confirm the visit. The visits ended in February of 2023 due to Father's incarceration.

Mr. Yingling testified that the children are affectionate with Father at visits and run up to Father at the beginning of visits to hug him. He also observed the children being loving toward the foster parents.

There were several concerning incidents that occurred during the visits. On one instance, Father brought [N.J.N.] high heeled shoes and told her that she had the legs for them. Another time he brought a live python to a supervised visit at the local public library. He failed to understand why doing so was problematic. On December 27, 2022, Father ended a visit early when he became visibly upset when attempting to assemble a doll house he had brought for [N.J.N].

Chelsea Crewe was assigned as the caseworker for this family beginning on February 15, 2022. After [twenty-two] months in care, Ms. Crewe still has concerns for Father's drug use, lack of verifiable income, lack of stable housing, mental health issues, and parenting deficiencies.

The children acknowledge [the] foster parents as their family. The children are happy and well-adjusted to their lives in the foster home. The foster parents actively participate in services . . . and the children have all of their needs met in the home. [N.J.N.] has been making progress with her anxiety since being placed with the foster parents and undergoing individual therapy.

At the conclusion of the termination hearing, [the GAL] agreed with WCCB that the best interests of the children would be served by the termination of parental rights of Father.

Orphans' Court Opinion, 4/13/23, at 3-9 (cleaned up).

At the hearing, Father testified on his own behalf, explaining that he had substantial difficulty getting his life in order. He requested more time to demonstrate that he could care for the children. Father also testified that he had a close emotional attachment with both children. On cross-examination,

he indicated that he would possibly need another one or two years before he would be in a position to perform his parental duties. He similarly conceded that as of the date of the hearing, the children's interests were best served by having them remain with the pre-adoptive foster family.

Following the hearing, the orphans' court issued a single order, that was entered at the respective dockets, terminating Father's parental rights to the children pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and § 2511(b). Father filed timely notices of appeal, and both he and the orphans' court complied with Pa.R.A.P. 1925. We consolidated the matters *sua sponte*. Father presents the following question for our consideration: "Whether the trial court erred in finding by clear and convincing evidence that [WCCB] met its burden, under 23 Pa.C.S. § 2511(b)?" Father's brief at 4.

Our standard of review is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand

observations of the parties spanning multiple hearings.  However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).

The grounds for termination of parental rights are contained within § 2511 and must be proven by clear and convincing evidence, which is evidence "that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  *Int. of M.E.*, 283 A.3d 820, 831 (Pa.Super. 2022) (citation omitted).  The court must engage in a bifurcated analysis to determine first whether parental conduct warrants termination pursuant to § 2511(a), and then look to § 2511(b), which requires consideration of the child's "developmental, physical and emotional needs and welfare[.]" *Int. of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citation omitted).

Father does not contest that WCCB sufficiently proved that subsection (a) grounds were established.  Instead, he asserts solely that WCCB failed to meet its burden as to subsection (b).  In whole, that provision provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to [provisions not implicated herein], the court shall not consider any efforts by the parent to remedy the conditions described

- 7 -

therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Our High Court has recently framed the analysis of § 2511(b) thusly:

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Int. of K.T.*, *supra* at 1105–06 (cleaned up).

This Court has highlighted that "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). Assuming there is a bond, "the trial court must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship[.]'" *Int. of M.E.*, *supra* at 837 (citation omitted). Additionally, our Supreme Court has observed that while termination of parental rights has "heavy and

irrevocable consequences," it is nonetheless "intended to prevent children from growing up in an indefinite state of limbo, without parents capable of caring for them, and at the same time unavailable for adoption by loving and willing foster families." *Int. of K.T.*, *supra* at 1111 (cleaned up).

With this legal framework in mind, we turn to Father's sole issue on appeal. He argues that WCCB did not meet its burden pursuant to § 2511(b) because there was insufficient evidence as to what impact termination of his parental bond would have on the children. *See* Father's brief at 11. He highlights that several witnesses testified as to the existence of a bond; however, Dr. Rosenblum was unable to assess the detriment either child would experience if the relationship was severed, since Father never participated in an interactional assessment. *Id*. Accordingly, Father contends that the orphans' court lacked a basis in which to ascertain whether the trauma caused by termination was outweighed by the benefit of moving them into a permanent home with the pre-adoptive foster family. *Id*. at 10.

As to its subsection (b) analysis, the orphans' court stated the following:

> While the oldest child does appear to enjoy her visits with Father, the children are currently thriving and making developmental progress in their placement. Because Father did not appear for the interactional assessment with Dr. Rosenblum, the doctor was unable to assess what, if any, impact the children would experience if Father's parental rights were terminated. The children have become rooted in their foster family and removing them from this family would cause them further distress, as they have developed stability in their current home.

The children report feeling safe and secure in their current home. They are well-adjusted to their schedules. The children have developed secure and beneficial relationships with [the] foster parents and are residing in a safe and predictable home. For these reasons, this court is convinced that termination of . . . Father's parental rights would best serve the needs and welfare of the children.

Orphans' Court Opinion, 4/13/23, at 12 (cleaned up).

Notably, Father's argument focuses exclusively upon the existence of a bond between him and his children. He does not assert that any such relationship was necessary or beneficial for the children, nor does he discuss the relationship between either child and the foster family. In short, he asks us to mechanically apply our caselaw speaking to the importance of analyzing parental bonds and thereby overlook the best interests and the needs and welfare of the children. Considering our High Court's recent pronouncement in *Int. of K.T.*, *supra* at 1105-06, which favors a particularized review of a child's needs and welfare over the rote application of the statute, we reject Father's request to elevate the incomplete bond analysis over the intangible evidence relating to love, comfort, security, stability and permanency. After a comprehensive review of the record, we find well-supported the orphans' court's conclusion that the children's developmental, physical, and emotional needs and welfare warranted the termination of Father's parental rights, such as to allow adoption by the foster parents.

First, there was no evidence at the hearing that any existing relationship between Father and the children was necessary or beneficial. *Int. of M.E.*,

*supra* at 837. Indeed, as between O.A.N. and Father, the orphans' court correctly concluded that the testimony did not demonstrate the presence of **any** bond. *See* Orphans' Court Opinion, 4/13/23, at 4. WCCB Caseworker Chelsea Crewe testified that during visits, Father devoted more attention to N.J.N., and there appeared to be less of an attempt by Father to bond with O.A.N. *See* N.T. Hearing, 4/6/23, at 123, 126. This preferential treatment by Father was a cause of concern for WCCB and was one consideration in its recommendation to terminate Father's parental rights as to O.A.N. *Id*. at 126. Without a beneficial bond between Father and O.A.N., the court could not find that severing that tie would lead to any "extreme emotional consequences" for O.A.N. *Int. of M.E.*, *supra* at 837.

Regarding N.J.N., the orphans' court determined that although there was a relationship between her and Father, it was a peer relationship, not that of a responsible parent caring for a child. *See* Orphans' Court Opinion, 4/13/23, at 6. This conclusion was supported by the testimony of multiple witnesses. Dustin Yingling attested that the visits with the children involved "play" and "basic fun," and Father never took parental actions such as disciplining the children. N.T. Hearing, 4/6/23, at 111. Father failed to provide food for the children during visits and did not plan or adequately prepare for activities. *Id*. at 123, 161. Ms. Crewe testified that N.J.N. felt responsible for making Father happy, and that he would often seek comfort and validation from her. *Id*. at 126. Several witnesses felt that N.J.N. was

parentified and working to overcome those effects. *Id*. at 21, 45. N.J.N. feared for Father's wellbeing when he was not incarcerated. *Id*. at 45. This non-parental relationship was further displayed by Father's admission that he is not currently capable of caring for the children. *Id*. at 161, 165. In all, the evidence dispelled the conclusion that Father's relationship with N.J.N was necessary or beneficial for her.

Additionally, the orphans' court properly considered the existence of the bond between the children and the foster family, and the detrimental effect of severing that relationship. *See Int. of K.T.*, *supra* at 1106. As Dr. Rosenblum testified, the children require "stability and the opportunity to have their emotional and developmental needs met on a consistent and continuing basis," and therefore recommended the court grant termination to allow for adoption. N.T. Hearing, 4/6/23, at 22. The certified record supports the conclusion that the pre-adoptive foster parents have been the source of the intangibles such as "love, comfort, security, and stability" for both children in the twenty-two months preceding the hearing. *Int. of K.T.*, *supra* at 1106.

Both children are strongly bonded with, and have a primary emotional connection to, the foster parents. *See* N.T. Hearing, 4/6/23, at 23, 142-43. They are likewise close with the foster siblings. *Id*. at 144. N.J.N. refers to the foster parents as "mom" and "dad," and the foster siblings are "sisters." *Id*. at 18-19. The foster parents have taken care of the special needs of the children, particularly aiding N.J.N. in treating her anxiety and taking O.A.N. to

speech therapy. *Id*. at 143. The testimony proved that the foster parents "put the children's emotional wellbeing first when making any decision within the home." *Id*. at 142. This all bears out the orphans' court's finding that removing the children from the foster family would cause them significant distress. *See* Orphans' Court Opinion, 4/13/23, at 12.

By his own concession, Father would need at least another one to two years before he could parent both children. *See* N.T. Hearing, 4/6/23, at 161. Had the court refused to terminate Father's parental rights, the children would be forced remain in an "indefinite state of limbo," depriving them of the opportunity to be adopted by the ready and willing foster parents. *Int. of K.T.*, *supra* at 1111. We cannot countenance that result. Accordingly, we find that WCCB met its burden pursuant to § 2511(b) and that the court's decision was supported by competent evidence.

Based on the foregoing, we affirm the orders of the orphans' court terminating Father's parental rights as to N.J.N. and O.A.N.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/6/2023